IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| WILLIAM SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 13-495-CG-M |
| | ) | |
| CITY OF GREENSBORO, POLICE | ) | |
| CHIEF WILLIE HUDSON, in his | ) | |
| individual capacity, and MAYOR | ) | |
| JOHNNIE WASHINGTON, in his | ) | |
| individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ORDER

A former city employee filed this discrimination case against the City of Greensboro, its police chief, and its mayor. William Smith ("Plaintiff") alleges the City of Greensboro, Police Chief Willie Hudson ("Chief Hudson"), and Mayor Johnnie Washington ("Mayor Washington") (collectively, "Defendants") terminated his job as a police officer after he expressed his support for a white mayoral candidate instead of a black mayoral candidate. (Doc. 2, pp. 2 – 4). Before the Court are Defendants' Motion for Summary Judgment (Doc. 31) and supporting materials (Docs. 30 – 32), Plaintiff's response in opposition to the motion (Doc. 38), and Defendants' reply. (Docs. 39, 40). Upon careful consideration and for the reasons set forth herein, Defendants' motion for summary judgment is due to be granted.

## I.      Procedural History

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") before initiating this lawsuit. The EEOC issued Plaintiff's right to sue letter on July 11, 2013. (Doc. 30, Exh. 14, p. 2). On October 11, 2013, Plaintiff filed his complaint against Chief Hudson and Mayor Washington in their individual capacities, and the City of Greensboro. (Doc. 1, p. 1). In his complaint, Plaintiff alleges Defendants unlawfully discriminated against him based on his support for a white mayoral candidate. (Doc. 1, p. 3). Plaintiff states Defendants "acted willfully, knowingly, and with specific intent to deprive the Plaintiff of his rights . . . , including his right to the exercise of free speech and to due process of law." (Doc. 1, pp. 4 – 5). As a result, Plaintiff contends Defendants violated his rights secured under the First, Fifth, and Fourteenth Amendments, 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 1985, and Title VII of the Civil Rights Act of 1964. (Doc. 2, pp. 1, 5). "Plaintiff is also pursuing the Alabama state law torts of negligent/malicious hiring, negligent supervision and training and outrage/intentional infliction of emotion[al] distress." (Doc. 2, p. 1).

Following discovery, Defendants filed a motion for summary judgment addressing each of Plaintiff's claims against the City of Greensboro, Chief Hudson, and Mayor Washington. (Doc. 31, pp. 15 – 38). Defendants primarily argue (1) Plaintiff has not shown discriminatory animus in this case (Doc. 31, p. 10); (2) Plaintiff has not suffered an adverse employment action (Doc. 31, p.

15); (3) Plaintiff has not stated a *prima facie* discrimination case (Doc. 38, p. 19); and (4) the statute of limitations bars Plaintiff's claim. (Doc. 31, pp. 21, 32). Defendants further argue certain claims against them are procedurally improper. (Doc. 31, pp. 22, 31).

Plaintiff contends there are disputed issues of material fact that prohibit granting Defendants' motion for summary judgment as a matter of law, though he concedes several of his claims in his response. (Doc. 38, p. 1, n. 1, p. 2). Plaintiff supports his remaining claims with a signed declaration. (Doc. 38, Exh. 1). Defendants replied to Plaintiff's response (Doc. 39), and filed an objection to Plaintiff's declaration. (Doc. 40).

## II.   Standard of Review

The court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(c) governs procedures and provides that a party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion. This includes "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The mere existence of a factual dispute will not automatically necessitate denial;

rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 809 (11th Cir. 2004).

The substantive law of the plaintiff's cause of action determines which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If a non-moving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323.  In reviewing whether a non-moving party has met its burden, the Court must stop short of weighing the evidence and determining credibility. Instead, the Court must draw all justifiable inferences in favor of the non-moving party. Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 – 99 (11th Cir. 1992) (internal citations and quotations omitted). Thus the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251–52.

### III.   Facts

Plaintiff worked as a police officer in the Greensboro Police Department from 2006 until December 2012. (Doc. 32, pp. 1, 7). From 2006 until roughly November 2012, Plaintiff worked the night shift so he could drive a school bus during the day. (Doc. 32, p. 2). Driving the school bus allowed Plaintiff to supplement his police officer income. (Doc. 38, p. 6).

In 2008, the City of Greensboro elected Johnnie Washington as Mayor. (Doc. 32, p. 2). In 2010, the Greensboro City Council appointed police officer Hudson the Chief of Police. (Doc. 32, p. 2). Chief Hudson put police officers on a rotating shift, with the exception of Plaintiff who continued to work the night shift.[1] (Doc. 32, pp. 2 – 3).

After Willie Hudson became the Chief of Police, he and Plaintiff began having tense exchanges about work. (Doc. 31, p. 4). In January 2011, Chief Hudson gave a "Letter of Counseling" to Plaintiff regarding problems they needed to resolve. (Doc. 30, Exh. 17, p. 2). Among other things, the letter explains that it is difficult to "get in touch with [Plaintiff] when he is off duty …, [and] this problem need[s] to be fixed now." (Doc. 30, Exh. 17, p. 2). The letter also states Chief Hudson and Plaintiff "discussed [Plainitff's] work and following up on his reports, making sure he is doing his job to the fullest." (Doc. 30, Exh. 17, p. 2). Chief Hudson signed the letter, and Officer Michael Hamilton witnessed it. (Doc. 30, Exh. 17, p. 2). Above the signature line for Plaintiff William Smith are the words "refuse to sign" and initials "WS." (Doc. 30. Exh. 17, p. 2).

In February 2011, Plaintiff wrote a 13-page letter addressed to "whom it may concern" describing various problems he was having with the Greensboro Police Department and Defendant Hudson. (Doc. 32, p. 4). Plaintiff stated he "never thought anything" about certain issues "until our

---

[1] All members of the Greensboro Police Department are currently on a rotating shift. (Doc. 30, Exh. 22, p. 17).

Dept. meeting on Oct. 7, 2010 when Hudson addressed his rank after taking over as chief." (Doc. 30, Exh. 25, pp. 3). Plaintiff goes on to describe meeting with Chief Hudson individually after the department meeting. During the meeting, Chief Hudson asked "are you ready to work for me," and Plaintiff said, "if you're the chief then I guess so." (Doc. 30, Exh. 25, p. 5).

The same letter describes other incidents involving Chief Hudson and Plaintiff. At one time, Chief Hudson went to Plaintiff's house because Plaintiff was needed at City Hall. (Doc. 30, Exh. 25, pp. 9 – 10). This deeply troubled Plaintiff, as noted in his letter, because he did not want Chief Hudson showing up at his home. (Doc. 30, Exh. 25, pp. 9 – 13; Exh. 1, p. 15). Plaintiff also contacted Mayor Washington so they could meet and discuss his problems with Chief Hudson. (Doc. 30, Exh. 25, p. 10). Plaintiff also explains how another officer told him "Chief Hudson said that he knows how to fix me. He'll put me on all days so I can't drive my bus route." (Doc. 30, Exh. 25, p. 11). Plaintiff ends the letter saying, "I need my job. If I'm no longer able to drive a route in the mornings please let me know. But I would like to request doing so until May." (Doc. 30, Exh. 25, p. 14).

After writing his letter, Plaintiff requested on February 18, 2011 a hearing before the City of Greensboro Grievance Committee. (Doc. 30, Exh. 18). The Grievance Committee held a hearing for Plaintiff on March 1, 2011. (Doc. 30, Exh. 19). The record does not show that the Grievance Committee took any action after this hearing. (Doc. 31, p. 5).

6

Mayor Washington ran again for mayor in 2012, and won re-election. During this time, Plaintiff supported mayoral candidate Stephen Gentry.[2] (Doc. 38, p. 4). Plaintiff states his support for Stephen Gentry, the white candidate, put his job in jeopardy. (Doc. 2, p. 3). Mayor Washington is black, Chief Hudson is black, Plaintiff is black, and mayoral candidate Gentry is white. (Doc. 31, p. 5).

Plaintiff says he never made statements about Candidate Gentry at work. (Doc. 38, p. 4). While off-duty, however, he and Willie Lewis, another City of Greensboro Police Officer, "vocalized their support for Candidate Gentry to other officers and members of the community, including Assistant Chief Mike Hamilton, Terry Hamilton, and Claude Hamilton." (Doc. 38, p. 4). Plaintiff further alleges Assistant Chief Mike Hamilton called him and said the City was going to get rid of fellow officer Willie Lewis because of his support for Gentry.[3] (Doc. 38, p. 5). Plaintiff also states "[b]efore it was generally known that [he] was supporting Candidate Gentry for mayor, he had never encountered any problem with working all night shifts." (Doc. 38, p. 7). Plaintiff does not allege he told Chief Hudson or Mayor Washington about his support of Candidate Gentry. (Doc. 38, pp. 2 – 9, Exh. 1).

After the City of Greensboro elected Mayor Washington for a second

---

[2] Defendants also note, and Plaintiff does not dispute, that Plaintiff lived outside city limits and could not vote in the City of Greensboro's elections. (Doc. 31, p. 5; Doc. 39, p. 4).
[3] Willie Lewis is currently serving as Sergeant in the Greensboro Police Department. (Doc. 30, Exh. 22, p. 17).

term, Chief Hudson put Plaintiff on a rotating shift along with the other police officers in the Greensboro Police Department. (Doc. 38, p. 7). About the same time, Plaintiff brought a doctor's note to the police station stating he needed six weeks off from work with no further explanation. (Doc. 30, Exh. 4; Doc. 38, p. 7). The City Attorney then asked for additional information regarding Plaintiff's request for a medical absence. (Doc. 30, Exh. 5, p. 2; Doc. 38, p. 8). Defendants wanted to know why Plaintiff could continue to perform his second job as a school bus driver but not work as a police officer. (Doc. 30, Exh. 5, p. 2). Plaintiff provided a second doctor's note, which stated "Pt. excused from Greensboro Police dept. for 6 weeks from date of visit." (Doc. 30, Exh. 6). Plaintiff stopped showing up for work.

On December 20, 2012, the City Attorney informed Plaintiff in a letter that Plaintiff had abandoned his job. (Doc. 30, Exh. 7). On December 28, Plaintiff requested a grievance hearing concerning his alleged job abandonment. (Doc. 30, Exh. 9). The Grievance Committee met with Plaintiff on January 10, 2013. (Doc. 30, Exh. 3, p. 4). At the hearing before the Grievance Committee, Plaintiff said he was not sure if he would return to work because he had other job opportunities. (Doc. 30, Exh. 3, p. 4). After the hearing, the City Attorney explained in a letter to Plaintiff, "you were not fired nor did you receive any disciplinary action from your request for six weeks of sick leave." (Doc. 30, Exh. 11, p. 2). The City Attorney further explained to Plaintiff he could either return to his job immediately *or* provide

sufficient medical proof to explain his continued absence. (Doc. 30, Exh. 11, p. 2; Doc. 31, pp. 7 – 8). Plaintiff elected not to return to work or provide medical proof for his absence, and he is no longer employed with the Greensboro Police Department. (Doc. 31, p. 8).

## IV.   Analysis

### a.  Procedurally deficient and conceded claims

At the outset, the Court notes Plaintiff concedes several claims in his response to Defendants' motion for summary judgment. (Doc. 38, p. 1, n. 1). Plaintiff drops the following claims against the City of Greensboro: race discrimination pursuant to 42 U.S.C. § 1981 and § 1983, violations of the First and Fourteenth Amendments, and the Alabama tort of negligent, retention, supervision, and training. (Doc. 38, p. 1, n. 1). The Court further notes the City of Greensboro cannot be held liable for an intentional tort, i.e., intentional infliction of emotional distress. Walker v. City of Huntsville, 62 So. 3d 474, 501-02 (Ala. 2010).  The remaining claims against the City of Greensboro are brought pursuant to Title VII for race discrimination and retaliation. (Doc. 2, p. 6).

Plaintiff also concedes his Due Process Property Right claims against Chief Hudson and Mayor Washington.[4] (Doc. 38, p. 1, n. 1). Additionally, Plaintiff's claims against Chief Hudson and Mayor Washington for violating

---

[4] The Fifth Amendment applies to federal actors. Jordan v. Mosley, 298 Fed. App'x. 803, 806 n. 5 (11th Cir. 2008) (citing Knoetze v. U.S. Dep't of State, 634 F.2d 207, 211 (5th Cir. 1981)). Plaintiff does not allege federal actors are involved here.

9

42 U.S.C. § 1985 are unfounded. Section 1985 pertains to conspiracies to interfere with civil rights. Plaintiff fails to allege facts indicating Defendants reached an "understanding" to deny Plaintiff his rights. Grider v. City of Auburn, Ala., 618 F.3d 1240, 1260 (11th Cir. 2010) ("The plaintiff attempting to prove such a conspiracy must show that the parties 'reached an understanding' to deny the plaintiff his or her rights.").

Even if Plaintiff adequately alleged a section 1985 conspiracy, the intracorporate doctrine bars recovery for this claim. "[U]nder the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." Id. at 1261; accord Denney v. City of Albany, 247 F.3d 1172, 1190–91 (11th Cir. 2001) (stating "the only two conspirators identified ... are both City employees; no outsiders are alleged to be involved" and concluding intracorporate conspiracy doctrine barred plaintiffs' § 1985(3) conspiracy claims for deprivation of their equal protection rights). "The doctrine applies to public entities such as the City and its personnel." Denney, 247 F.3d at 1190.[5] In this case, both individual defendants are city employees. The

---

[5] The exceptions to the intracorporate doctrine do not apply here. Other circuits, while applying the intracorporate conspiracy doctrine in § 1985 civil rights cases, have recognized exceptions (1) for "convictions involving criminal charges of conspiracy," (2) where the employee has an "independent personal stake" in his unconstitutional acts and is not acting to further the corporation's illegal objective, or (3) where the employees "engage in a series of discriminatory acts as opposed to a single action" over a significant period of time in the employment setting. Grider v. City of Auburn, Ala., 618 F.3d 1240, 1263 (11th Cir. 2010) (citing Dickerson, 200 F.3d at 768–70 & n. 9)).

remaining defendant is the City of Greensboro itself. No outsiders are involved. Accordingly, Plaintiff's claims under 42 U.S.C. § 1985 fail.

Plaintiff also concedes his 42 U.S.C. § 1981 claims against Chief Hudson and Mayor Washington by failing to address them in his response. Lyes v. City of Riviera Beach, Fla., 126 F.3d 1380, 1388 (11th Cir. 1997) (noting that "'the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned'") (citation omitted), reh'g granted and vacated by 136 F.3d 1295 (1998), reinstated by 166 F.3d 1332, 1336 (11th Cir. 1999) (en banc); Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp., 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment").

The remaining claims against Chief Hudson and Mayor Washington are for violations of the First and Fourteenth Amendments, and intentional infliction of emotional distress. (Doc. 2, pp. 5 – 6). The Court turns now to the surviving claims, starting with intentional infliction of emotional distress.

### b.  Intentional Infliction of Emotional Distress

Alabama defines intentional infliction of emotional distress as "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional

distress and for bodily harm resulting from the distress. The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it." Harrelson v. R.J., 882 So. 2d 317, 321 (Ala. 2003) (citations and quotations omitted). Thus, in order to prevail on this claim, Plaintiff must present substantial evidence indicating that Chief Hudson and Mayor Washington's conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." Thomas v. BSE Indus. Contractors, Inc. et. al, 624 So. 2d 1041, 1043 (Ala. 1993). These elements make this tort "an extremely limited cause of action." Ex parte Bole, 103 So. 3d 40, 52 (Ala. 2012).  Indeed, the Alabama Supreme Court has generally limited the tort to three kinds of conduct: (1) wrongful conduct in the family-burial context, Whitt v. Hulsey, 519 So. 2d 901 (Ala. 1987); (2) barbaric methods employed to coerce an insurance settlement, Nat'l Sec. Fire & Cas. Co. v. Bowen, 447 So. 2d 133 (Ala. 1983); and (3) egregious sexual harassment, Busby v. Truswal Sys. Corp., 551 So. 2d 322 (Ala. 1989).[6]

Plaintiff argues Chief Hudson acted intentionally because he knew changing Plaintiff's shift would cause him to lose his second job as a bus

---

[6]    That is not to say, however, that the tort of outrage is viable in only these three circumstances. Recently, the Alabama Supreme Court affirmed a judgment on a tort-of-outrage claim asserted against a family physician who, when asked by a teenage boy's mother to counsel the boy concerning his stress over his parents' divorce, instead began exchanging addictive prescription drugs for homosexual sex for a number of years, resulting in the boy's drug addiction. See O'Rear v. B.H., 69 So. 3d 106 (Ala. 2011).

driver. (Doc. 38, p. 27). Plaintiff told Chief Hudson and Mayor Washington he needed to be able to work his second job to make ends meet. (Doc. 38, p. 27). Plaintiff states he experienced emotional distress from being mistreated by Chief Hudson and ignored by Mayor Washington. (Doc. 38, p. 27). Plaintiff further states the emotional distress was so severe that he sought six-weeks of leave from his job as a police officer. (Doc. 38, p. 27). At a hearing before the Grievance Committee, however, Plaintiff "stated he wasn't sure that he wanted to return to work because he had other job opportunities." (Doc. 30, Exh. 3, p. 4). Defendants also told Plaintiff more than once that he could "return to work immediately" or provide sufficient medical proof for his sick leave. (Doc. 30, Exh. 11, p. 2).

Here, the Court concludes as a matter of law that the circumstances were not so extreme as to constitute intentional infliction of emotional distress. Even assuming Defendants' conduct was intentional, it did not "go beyond all possible bounds of decency" to be regarded as "atrocious and utterly intolerable in a civilized society." Green Tree Acceptance, Inc. v. Standridge, 565 So. 2d 38, 44 (Ala. 1990). Chief Hudson added Plaintiff to the shift rotation after Plaintiff had exclusively worked the night shift, which meant Plaintiff would have to work some days and some nights. A shift change within the Greensboro Police Department does not amount to atrocious conduct. Similarly, the fact that Mayor Washington met with Plaintiff about scheduling concerns (Doc. 30, Exh. 24, p. 3), and then

"ignored" Plaintiff's requests to work exclusively night shifts is not outrageous. (Doc. 38, p. 27). Plaintiff kept his job with the police department, and Defendants even invited him to return after his absence. (Doc. 30, Exh. 11, p. 2). These facts simply do not support a finding of outrageous conduct as a matter of law. Defendants' motion for summary judgment on the intentional infliction of emotional distress claim is **GRANTED.**

### c.  First Amendment Retaliation Claim

In his complaint, Plaintiff states he "openly supported and campaigned for Stephen Gentry," a candidate for mayor, for which "he was punished and eventually discharged." (Doc. 2, p. 5). Plaintiff also contends "Defendants retaliated against him for the exercise of free speech." (Doc. 2, p. 5). Construing Plaintiff's complaint liberally, he alleges a violation of free association. Plaintiff similarly argues in his response that Defendants violated his right to free association under the First Amendment by retaliating against him for supporting a specific mayoral candidate. (Doc. 38, pp. 10 – 11).

The First Amendment prohibits the state from denying its citizens the right to associate with whomever they choose, just as it prevents the state from compelling any such association. Rutan v. Republican Party of Illinois, 497 U.S. 62, 71 (1990). Among the terms and conditions of public employment that invoke First Amendment scrutiny are "promotions, transfers, and recalls after layoffs based on political affiliation or support." Id. at 75. Similarly, the

First Amendment protects government employees from adverse employment actions that infringe upon their "constitutional right to freedom of expression." Rankin v. McPherson, 483 U.S. 378, 383–84 (1987). A corollary of these propositions is that the government may not alter its employees' work conditions "in retaliation for" their having exercised their First Amendment rights. Morgan v. Ford, 6 F.3d 750, 753–54 (11th Cir. 1993).

Analyzing whether a government employee's freedom of association rights have been infringed involves a three-part test. Green v. City of Montgomery, 792 F. Supp. 1238, 1252 (M.D. Ala. 1992).[7] The first step is balancing an employer's interest in maintaining an efficient workplace against the weight accorded to the employee's First Amendment rights. Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968). Paramilitary organizations, like police departments, have unique interests to consider for this step. See Eiland v. City of Montgomery, 797 F.2d 953, 959 (11th Cir. 1986) (discussing paramilitary nature of a police department and the need to preserve departmental respect and discipline). If the First Amendment interest is of sufficient importance, the plaintiff then has the burden of showing that the protected activity "was a substantial motivating factor in the" decision made regarding their employment status. Morgan, 6 F.3d at 754 (internal quotations omitted). If the plaintiff demonstrates this, the burden

---

[7] The Eleventh Circuit does not require Plaintiffs to demonstrate that their claimed freedom of association pertains to matters of public concern. Hatcher v. Bd. of Pub. Educ. & Orphanage for Bibb Cnty, 809 F.2d 1546, 1558 (11th Cir. 1987).

shifts to the defendant to prove by a preponderance of the evidence that they would have made the same employment decisions, regardless of the parties' divergent political inclinations. Anderson v. Burke Cnty., Ga., 239 F.3d 1216, 1219 (11th Cir. 2001) (citation omitted).

Here, Plaintiff states there are "no competing interests to balance" because he never "expressed his political views or support for Candidate Gentry while on duty." (Doc. 38, p. 15). Defendants similarly state "they were unaware of whom Plaintiff Smith supported in the 2012 mayoral election." (Doc. 31, p. 13). Defendants further observe Plaintiff "nowhere described [the speech or association] with the requisite particularity" needed to weigh the relevant competing interests. (Doc. 31, p. 15). The Court, therefore, finds Plaintiff fails to show how his alleged speech or association outweighs Defendants' competing interests in the efficient operation of the Greensboro Police Department.

The Court next considers whether Plaintiff's speech or conduct motivated Chief Hudson and Mayor Washington to retaliate against him. Plaintiff essentially alleges two adverse employment actions: a shift change and termination. (Doc. 2, p. 5). Generally, a shift change, without more, is not considered an adverse employment action. See, e.g., Crawford v. Carroll, 529 F.3d 961, 970-71 (11th Cir. 2008) (serious and material change needed to show adverse employment action); Gray v. Vestavia Hills Bd. of Educ., 317 Fed. App'x 898, 904 (11th Cir. 2008). In some cases, however, a shift change

16

can amount to adverse employment action. <u>See</u>, <u>e.g.</u>, <u>Taylor v. Roche</u>, 196 Fed. App'x 799, 803 (11th Cir. 2006) (different shift assignment may amount to adverse employment actions if it results in "serious and material" change). Because Plaintiff alleges direct economic harm as a result of the shift change, the Court will assume *arguendo* that it was an adverse employment action. The facts alleged, however, do not show Chief Hudson or Mayor Washington terminated Plaintiff. Instead, the City made that decision after Plaintiff abandoned his job. (Doc. 30, Exh. 7, 11). Plaintiff's termination is not an adverse employment action.

Assuming the shift change is an adverse employment action, Plaintiff must show his protected speech or conduct motivated Defendants to retaliate against him. To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct and that the protected activity and the adverse act were at least somewhat related and in close temporal proximity. <u>Higdon v. Jackson</u>, 393 F.3d 1211, 1220 (11th Cir. 2004).

Plaintiff does not allege he told or otherwise informed Chief Hudson or Mayor Washington about his support of candidate Stephen Gentry. (Doc. 39, p. 5). Plaintiff does not identify or provide any information from other witnesses who knew which candidate he supported. (Doc. 40). Chief Hudson and Mayor Washington maintain that they did not know which candidate Plaintiff supported for mayor in 2012, and Plaintiff does not refute this testimony. (Doc. 39, p. 6). Additionally, Mayor Washington did not participate

in or direct any decision regarding Plaintiff's shift change or employment with the police department. (Doc. 39, p. 5, n. 3). In sum, Plaintiff does not show a causal connection between his alleged protected activity and his alleged adverse employment action.

Although Plaintiff did not fully satisfy the first two steps in the analysis, the Court will nevertheless examine Chief Hudson and Mayor Washington's proffered reasons for Plaintiff's shift change and termination. The employer must show "by a preponderance of the evidence, that, in light of their knowledge, perceptions, and policies at the time of the termination, [they] would have terminated [the employee] regardless of [the protected] speech." Board of Cnty Comm'rs, Wabaunsee Cty., Kansas v. Umbehr, 518 U.S. 668, 685 (1996).

Almost two years before Chief Hudson added Plaintiff to the rotating shift, he set forth concerns regarding Plaintiff's work in a "letter of counseling." (Doc. 30, Exh. 17). Plaintiff himself discusses work problems in a letter dated February 12, 2011, or 19 months before the 2012 election. (Doc. 30, Exh. 25). Defendants show they changed Plaintiff's shift for non-discriminatory reasons, including difficulty reaching Plaintiff off-duty, and making sure he followed up on his reports. (Doc. 30, Exh. 17; Exh. 22, p. 10; Doc. 31, p. 4).

After Chief Hudson added Plaintiff to the rotating shift, Plaintiff left his job. Defendants invited Plaintiff to return to his job, but Plaintiff decided

not to. Defendants clearly show Plaintiff abandoned his job, thus they would have terminated his employment regardless of any protected speech or association. Defendants show by a preponderance of the evidence that they would have reached the same employment decisions in the absence of Plaintiff's alleged protected conduct.

Because Plaintiff failed to satisfy the competing interest and motivating factor steps, and Defendants nevertheless proved they would have reached the same employment decisions in this case, Defendants' motion for summary judgment on Plaintiff's First Amendment claims against Chief Hudson and Mayor Washington is **GRANTED**.

### d. Racial Discrimination Claim

Plaintiff claims Defendants denied him equal protection under the law. (Doc. 2, p. 6). Plaintiff raises a Section 1983 cause of action against Chief Hudson and Mayor Washington. Section 1983 authorizes suits to redress deprivations of civil rights by persons acting "under color of any [state] statute, ordinance, regulation, custom, or usage." 42 U.S.C. § 1983; see also Hafer v. Melo, 502 U.S. 21, 27 (1991). Plaintiff also raises a Title VII cause of action against the City of Greensboro. Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

"When section 1983 is used as a parallel remedy for violation of section 703 of Title VII [42 U.S.C. § 2000e–2], the elements of the two causes of action are the same." Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation, 49 F.3d 1490, 1508 (11th Cir. 1995) (citations omitted); see also Crawford, 529 F.3d at 970 (analysis of claims under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same). For these similar claims, the Court will first determine if Plaintiff timely filed his EEOC charge, and then examine if Plaintiff has stated a *prima facie* discrimination or retaliation case.

### i. EEOC filing requirements

Defendants maintain that this action is time-barred. (Doc. 31, pp. 31 – 33). Title VII requires a complainant to bring a civil action within 90 days after receiving notice that the EEOC is dismissing a charge of discrimination. See 42 U.S.C. § 2000e–5(f)(1). As stated in Plaintiff's EEOC right-to-sue letter (Doc. 30, Exh. 14, p. 2), the 90–day period starts when a plaintiff receives the letter, not when the EEOC issues it. After the defendant contests this issue, the plaintiff has the burden of establishing that he met the ninety-day filing requirement. Jackson v. Seaboard Coast Line R.R. Co., 678 F.2d 992, 1010 (11th Cir. 1982).

In certain circumstances, however, the Eleventh Circuit has applied the three-day rule under Fed. R. Civ. P. Rule 6(e) (for taking action after service by mail), to compute when the 90–day period begins to run. Zillyette

v. Capital One Financial Corp., 179 F.3d 1337, 1342 (11th Cir. 1999)

(allowing three days for plaintiff to pick up unsuccessfully delivered certified

right-to-sue letter from EEOC). Other appellate courts similarly recognize

"[w]hen the date on which a right-to-sue letter was actually received is either

unknown or disputed, courts have presumed various receipt dates ranging

from three to seven days after the letter was mailed." Taylor v. Books A

Million, 296 F.3d 376, 379 (5th Cir. 2002); Lozano v. Ashcroft, 258 F.3d 1160,

1165 (10th Cir. 2001) (absent evidence of the actual date of receipt, a three-

day or five-day presumption of receipt after mailing is generally appropriate);

Banks v. Rockwell Intern. N. Am. Aircraft Operations, 855 F.2d 324, 326 (6th

Cir. 1988) (applying a five-day presumption for receipt of right-to-sue letter).

    In this case, Plaintiff attests he does not remember exactly when he

received the right-to-sue letter from the EEOC. The EEOC issued the letter

on Thursday, July 11, 2013. (Doc. 30, Exh. 14, p. 2). Plaintiff filed his

complaint on October 11, 2013, or 91 days after the EEOC mailed its letter.

Without proof of when Plaintiff received his right-to-sue letter, the Court

presumes that the date on which he received the letter was three days after

the letter was mailed, which is Monday, July 15, 2013.[8] Kerr v. McDonald's

---

[8] Pursuant to Rule 6 of the Federal Rules of Civil Procedure, the day of the
event triggering the time period is excluded from the calculation. July 14,
2013 is technically three days from the date the EEOC mailed the right to
sue letter; however, July 14th was a Sunday and Rule 6(a)(1)(C) of the
Federal Rules of Civil Procedure states that "if the last day [of the limitations
period] is a Saturday, Sunday, or legal holiday, the period continues to run
until the end of the next day that is not a Saturday, Sunday or legal holiday."

Corp., 427 F.3d 947, 953 n. 9 (11th Cir. 2005) ("When the date of receipt is in dispute, this court has applied a presumption of three days for receipt by mail, akin to the time period established in Fed. R. Civ. P. 6(e)"). Moreover, allowing Plaintiff three days to receive the letter by mail does not mean Plaintiff is benefiting from a "manipulable open-ended time extension." Id. at 953.

Excluding the day of the event that triggers the limitations period, Fed. R. Civ. P. 6(1)(1)(A), and counting ninety days from July 15, 2013, the last day on which Plaintiff could file his Title VII claims would be Saturday, October 12, 2013; thus applying Rule 6(a)(1)(C), the last day on which Plaintiff may file rolls over to Monday, October 14, 2013. In 2013, Columbus Day, a federal holiday, fell on October 14, so Plaintiff actually had until Tuesday, October 15, 2013, to file his complaint.

Defendants also argue Plaintiff's claims pertaining to events that occurred prior to August 29, 2012 are barred by the limitations period on filing a charge with the EEOC. (Doc. 31, pp. 32 – 33). Defendants are correct that discrete discriminatory acts that took place before August 29, 2012 are not actionable, "even when they are related to acts alleged in timely filed charges." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002). However, each incident of discrimination and each retaliatory adverse employment decision - such as termination, failure to promote, or denial of

---

Thus, Monday, July 15, 2013 is the day on which Plaintiff is deemed to have received his right to sue letter.

transfer - constitutes a separate actionable "unlawful employment practice."
Nat'l R.R. Passenger Corp., 536 U.S. at 114.[9] And the "timely filing provision
only requires that a Title VII plaintiff file a charge within a certain number
of days after the unlawful practice happened." Id. at 117. See also Shaw v.
Mobile Cnty. Pub. Sch. Sys., No. CIV.A. 14-0111-CG-B, 2015 WL 419805, at
*5 n. 8 (S.D. Ala. Feb. 2, 2015) (describing how each discrete act "starts a new
clock for filing charges alleging that act").

Chief Hudson changed Plaintiff's schedule around November 2012, and
he left his job shortly thereafter. The schedule change is the discrete act that
started the 180-day clock for filing an EEOC charge. Plaintiff filed his EEOC
charge on February 27, 2013. (Doc. 31, p. 8). Accordingly, it appears
Plaintiff's Title VII claims are timely filed.

### ii.  Alleging a *Prima Facie* Discrimination Case

Plaintiff argues, "When Chief Hudson began treating Plaintiff Smith
differently because of his association with the white mayoral candidate, it
was because of his race." (Doc. 38, p. 20). Plaintiff further argues summary
judgment is inappropriate with regard to this claim because facts are present
showing Chief Hudson retaliated against Plaintiff, primarily Chief Hudson's
comments about other black people. (Doc. 38, p. 22). To prevail on a claim for

---

[9] Furthermore, the "existence of past acts and the employee's prior knowledge
of their occurrence ... does not bar employees from filing charges about
related discrete acts so long as the acts are independently discriminatory and
charges addressing those acts are themselves timely filed. Nor does the
statute bar an employee from using the prior acts as background evidence in
support of a timely claim." Id.

racial discrimination based on circumstantial evidence, Plaintiff must show:
1) he was a member of a protected minority, 2) he was qualified for the job, 3)
he suffered an adverse employment action, and 4) he was replaced by
someone outside his protected class or was treated less favorably than a
similarly situated individual outside his protected class. Crawford, 529 F.3d
at 970.

Title VII also prohibits retaliation against an employee because of race.
42 U.S.C. § 2000e-2. A prima facie case of retaliation under Title VII requires
the plaintiff to show that: (1) he engaged in an activity protected under Title
VII; (2) he suffered an adverse employment action; and (3) there was a causal
connection between the protected activity and the adverse employment
action. Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir.
2001). Title VII retaliation claims must be proved according to traditional
principles of but-for causation. "This requires proof that the unlawful
retaliation would not have occurred in the absence of the alleged wrongful
action or actions of the employer." Univ. of Texas Sw. Med. Ctr. v. Nassar,
133 S. Ct. 2517, 2533 (2013).[10]

In this case, Plaintiff does not satisfy the requirements for stating a
*prima facie* discrimination claim. As circumstantial evidence, Plaintiff

---

[10] The elements for a Title VII retaliation claim and a First Amendment
retaliation claim are similar, making the analyses practically the same.
Although Title VII retaliation claims were formerly evaluated using the
earlier discussed motivating factor test, the Supreme Court has recently
interpreted Title VII's retaliation provision to require proof of but-for
causation instead. See Nassar, 133 S. Ct. 2517 (2013).

provides only uncorroborated statements and hearsay regarding Chief

Hudson's views on politics in the City of Greensboro. (Doc. 38, p. 22). Plaintiff

attests Chief Hudson expressed to him and other officers "a general disdain

for the white political leadership in the City of Greensboro community and

stated that if he found out that an African-American officer supported them

in anyway that individual would suffer negative consequences." (Doc. 38,

Exh. 1, p. 3 – 4). Plaintiff, however, does not identify anyone else who heard

Chief Hudson make such statements, the times or places Chief Hudson made

these statements, or that he ever discussed the mayoral election with Chief

Hudson. Plaintiff states Defendants also targeted Willie Lewis, another

officer who supported candidate Gentry, but Lewis is now a ranking officer in

the Greensboro Police Department. (Doc. 39, p. 8). Plaintiff has also not

offered evidence showing how anyone outside his protected class was treated

differently in support of his claims.

Additionally, Plaintiff does not show Defendants retaliated against

him, and that "but for" his race he would not have suffered the shift change

or termination. Nassar, 133 S. Ct. at 2533. Plaintiff does not argue Mayor

Washington or the City of Greensboro participated in or approved of the shift

change within the police department. (Doc. 39, p. 8). Plaintiff does not

dispute Defendants gave him a chance to return to work, and the opportunity

to explain the need for his continued absence. (Doc. 38, Exh. 1, p. 8). Plaintiff

also ignores the correspondence and work-related problems he and Chief

Hudson experienced in early 2011, well before any campaigning for mayor began. Plaintiff has failed to link his shift change and termination with a viable claim of race discrimination or retaliation. In light of the foregoing, Defendants' motion for summary judgment for race discrimination and retaliation pursuant to Title VII and Section 1983 is **GRANTED**.

### V.    Conclusion

The Court finds Plaintiff has not demonstrated there are genuine disputes of material facts underlying his claims. As a result, Defendants' arguments can be decided as a matter of law. Accordingly, Defendants' Motion for Summary Judgment (Doc. 31) is **GRANTED.**

**DONE and ORDERED** this 12th day of March, 2015.

/s/ Callie V.S. Granade
**UNITED STATES DISTRICT JUDGE**